**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

------------------------------------------------------

|                        |   |                      |
|------------------------|---|----------------------|
|                        | : |                      |
| George Riley, et. al,  | : |                      |
|                        | : |                      |
| Plaintiffs,            | : | Civ. No. 06-0331 (DRD) |
|                        | : |                      |
| v.                     | : |                      |
|                        | : |                      |
| Devon Brown, et. al,   | : | **O P I N I O N**    |
|                        | : |                      |
| Defendants.            | : |                      |
|                        | : |                      |

------------------------------------------------------

George Riley
James J. Krivacska
Paul Cornwell
Vincent Macrina
William F. Vansciver
Richard A. Gibbs
Peter Braun
ADULT DIAGNOSTIC & TREATMENT CENTER
8 Production Way
Avenel, NJ 07001

*Pro se Plaintiffs*


Zulima V. Farber
Attorney General of New Jersey
Victoria L. Kuhn
Deputy Attorney General
Susan M. Scott
Deputy Attorney General
R.J. Hughes Justice Complex
P.O. Box 112
Trenton, New Jersey 08625

*Attorneys for State Defendants Devon Brown and William Plantier*

**DEBEVOISE, Senior District Judge**

Plaintiffs, George Riley, James J. Krivacska, Paul Cornwell, Vincent Macrina, William F. Vansciver, Richard A. Gibbs, and Peter Braun, who are state inmates currently housed in the Adult Diagnostic and Treatment Center ("ADTC") in Avenel, New Jersey, filed a complaint against Defendants, Devon Brown, Commissioner of the New Jersey Department of Corrections ("DOC"), William Plantier, Director of Operations for the DOC, and various John Does, employees of the DOC, claiming that Defendants denied them certain constitutional rights and unlawfully discriminated against them by failing to protect them from other state inmates during visits to other facilities for medical treatment and legal proceedings.

Specifically, Plaintiffs' complaint lists the following counts: (1) violation of the Fourteenth Amendment right to substantive and procedural due process; (2) violation of the Fourteenth Amendment right of equal protection; (3) violation of the First Amendment right to seek redress and to have access to the courts; (4) violation the New Jersey Law Against Discrimination and the Americans with Disabilities Act; and (5) violation of the Eighth Amendment protection against cruel and unusual punishment.  Plaintiffs sought a temporary restraining order or, in the alternative, a preliminary injunction.

In an opinion dated March 16, 2006, the court determined that Plaintiffs had demonstrated: a likelihood of success on the merits as to their Eighth Amendment claim of cruel and unusual punishment; a likelihood of suffering irreparable injury; that the harm the preliminary injunction would impose on the Defendants did not outweigh the harm to the Plaintiffs; and, that it is in the public's interest to protect Plaintiffs from the alleged violations.

2

Thus, in a contemporaneous order, the court issued a preliminary injunction compelling Defendants to employ certain measures to safeguard Plaintiffs' constitutional rights.  That order provided, in part, the following:

> When inmates are removed from the Adult Diagnostic and Treatment Center ("ADTC") in Avenel, New Jersey, (the "Avenel Inmates") and held or transported with inmates from other correctional institutions: i) they shall not be identified as inmates of Avenel; ii) inmates from other correctional institutions shall not be confined either in a vehicle or holding area so as to have physical access to the Avenel Inmates unless a guard is present who is able to prevent the Avenel Inmates from being subjected to violence from other inmates; iii) guards and other prison officials shall be directed to halt forthwith any verbal or physical assaults made by inmates upon Avenel Inmates; iv) prison authorities shall investigate and promptly report upon any violence committed against any Avenel Inmates.

The following motions are presently before the court: Defendants' motion to terminate, or in the alternative, modify the preliminary injunction; Defendants' motion to seal various confidential documents; Plaintiffs' motion for a second preliminary injunction;[1] and Plaintiffs' motion to postpone the automatic stay of the current preliminary injunction.[2]

---

[1] The Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(2) ("PLRA"), states that "[p]reliminary injunctive relief [with respect to prison conditions] shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required . . . for the entry of prospective relief and makes the order final before the expiration of the 90-day period." As such, the preliminary injunction that was issued on March 16, 2006 automatically expired on June 14, 2006.  Thus, Defendants' motion to dissolve that preliminary injunction is moot. Plaintiffs filed their motion for a second preliminary injunction to take effect upon expiration of the first preliminary injunction.

[2] Under the PLRA, § 3626(e)(2)(A), the filing of a motion to terminate a preliminary injunction, such as the one presently before the court triggers the running of a 30 day period after which the preliminary injunction is automatically stayed pending a final order ruling on the motion.  As Defendants' motion to terminate was filed on May 1, 2006 the injunction was automatically stayed on May 31, 2006.  Plaintiffs' filed their motion to postpone the automatic stay pursuant to 18 U.S.C. § 3626(e)(3).  Under that subsection, "[t]he court may postpone the effective date of an automatic stay specified in subsection (e)(2)(A) for not more than 60 days for

For the reasons set forth below, Plaintiffs' motion for a second preliminary injunction will be granted.  Plaintiffs motion to postpone the automatic stay will be dismissed as moot.  Defendants' motion to dissolve the preliminary injunction will be dismissed as moot.  Defendants' motion to seal various confidential documents will be addressed in a separate opinion.

## I.  <u>BACKGROUND</u>

The ADTC is a facility operated by the DOC for the detention and treatment of inmates who have been convicted of sexual offenses and found to be compulsive and repetitive in their offending behavior.  Plaintiffs allege that prisoners such as themselves, who have been convicted of sexual offenses, are the most despised and reviled inmates in the prison system.  As such, Plaintiffs allege that they are harassed and physically assaulted by other state inmates whenever they are exposed to those inmates, such as when they are transported to and detained in other facilities (e.g., when they seek medical care at another prison or attend a legal proceeding).  As Plaintiffs wish to represent a class of inmates they state that each member of the class has suffered from the violations alleged in the complaint and they include factual allegations that pertain to inmates other than those who are named as Plaintiffs in the present case.

With their original motion for a preliminary injunction, filed on January 18, 2006, Plaintiffs submitted affidavits to support the factual allegations in their complaint.  At the time, those allegations were not denied by counter-affidavits.  As to the present motions, both sides have submitted affidavits to support and/or contest the various factual allegations.

good cause."  However, as the court will issue a second preliminary injunction, Plaintiffs' motion to postpone the automatic stay is moot.

**Claims of Plaintiff Paul Cornwell**

Mr. Cornwell alleges that he was transported from ADTC to the New Jersey State Prison ("NJSP") on May 24, 2005 to receive physical therapy for a herniated disc.  After receiving medical treatment he was transported to the Garden State Correctional Facility and placed in a holding area with another ADTC inmate, Zhi-men Chen, and approximately twelve other state prisoners for a period of about three hours.

Mr. Cornwell alleges that when he and Mr. Chen were placed in the holding area, one of the two corrections officers announced to the other prisoners that Mr. Cornwell and Mr. Chen were from Avenel, implying that they were sex offenders.  The two officers then allegedly stood outside a Plexiglass window and observed the events that followed.

According to Mr. Cornwell, the other inmates began asking him and Mr. Chen questions. They first asked Mr. Chen where he was from and Mr. Chen responded that he was from ADTC. To that, another inmate said, "I know that place; that's where all the rapists go."  After several other questions another inmate allegedly asked Mr. Cornwell, "what did you do, rape a little girl?"  The inmate then allegedly stood up and began yelling, accusing Mr. Cornwell of raping a little girl.  The inmate then allegedly sat down next to Mr. Cornwell and punched him in the chest.  He then allegedly demanded the gold chain and cross that Mr. Cornwell was wearing.  Mr. Cornwell says that he replied, "I'm not giving you my fucking chain."

The inmate then allegedly stood up and offered Mr. Cornwell an outstreched hand, saying "I'm sorry."  When Mr. Cornwell shook the inmate's hand, the inmate allegedly pulled Mr. Cornwell forward and punched him in the left temple, knocking him to the floor and knocking

5

him unconscious.

Mr. Cornwell alleges that he was assaulted while he was unconscious and that when he awoke he had a large abrasion on his right arm and that the officers, still standing on the other side of the Plexiglass, had not responded.  Mr. Cornwell alleges that Mr. Chen gave a statement in which he said that after Mr. Cornwell was knocked out, the assault continued for several minutes and that Mr. Cornwell was "pummeled with fists and kicked with feet about his body while he was unconscious and defenseless" and yet the officers did nothing to stop the assault. Mr. Cornwell was then allegedly taken to the infirmary and given a bag of ice for his head.

After returning to ADTC Mr. Cornwell allegedly reported the incident to Sergeant Collins and was then examined by a nurse.  Mr. Cornwell alleges that his injuries included head injuries leading to dizziness and loss of consciousness, severe swelling in his face, and injuries to his right arm that eventually required surgery.  He says he was hospitalized for a total of 55 days and has a permanent scar on his right arm because of the assault.  He further alleges that he suffered severe psychological symptoms and that he was diagnosed as having post-traumatic stress disorder resulting from the assault.

Mr. Cornwell further alleges that since the attack he has declined medical treatment because he is afraid of suffering another attack.  He says he filed a grievance with the DOC regarding the May 24th incident but that the DOC rejected it.  He also says that he filed a Tort Claim Notice against the DOC but that it was denied.  As such, he says the DOC has been deliberately indifferent to the risk of future attacks.

Defendants admit that Mr. Cornwell was assaulted and that he "suffered a contusion to

6

his left eye, reddened area of [sic] the back of his head, a bloody nose and an abrasion to his right elbow." (Pl.'s Br. in Support of Mot. to Terminate at 11).  However, they argue that the corrections officer did not tell the other inmates that Mr. Cornwell was from ADTC.  Rather, Defendants state that the other inmates learned of Mr. Cornwell's origin because Mr. Cornwell told them where he was from.  Defendants rely on Mr. Cornewll's statement following the incident in which he said that another state inmate asked him where he was from, that he told the other inmate he was from ADTC, and that the other inmate then began hitting him.  But that statement is not inconsistent with Mr. Cornwell's account of the incident in his affidavit in which he says the corrections officer announced that Mr. Cornwell was from Avenel and other inmates subsequently questioned him and Mr. Chen.

Additionally, Defendants argue that in waiting to stop the assault the corrections officers were following procedure.  DOC procedure provides that when an officer witnesses an altercation between inmates the official is to notify Central Control of a "Code 33," thus letting Central Control know that there is an emergency and the officer needs assistance.  The emergency is then announced over the public address system and via radio.  A minimum of one sergeant and five officers will respond.  Moreover, the observing officer is instructed to wait for other officers to arrive before entering the holding cell to break up a fight.

Plaintiffs point out that approximately 12 minutes passed between the time the fight began and the time that officers entered the holding cell.[3]

---

[3] Sergeant Claudius Bryant's Incident Report indicates that the time of the incident was 4:28 pm.  (Mathews Aff. Ex. B).  According to the reports submitted by officers who responded to the scene, 4:40 pm is the earliest that any of them arrived on the scene to stop the attack.  (See e.g., Sergeant Eric Wallenburg's Special Report, Mathews Aff. Ex. B).

**Claims of Plaintiff Peter Braun**

Plaintiff, Peter Braun, alleges that he was assaulted by a state inmate from another facility when he was returning from a court hearing at the Union County Courthouse on December 13, 2005.  Specifically, Mr. Braun alleges that he was driven past the ADTC facility in Avenel to Bordentown, in Mercer County, where he was transferred to a van in the parking lot of the Garden State Youth Correctional Facility.  Mr. Braun further states that he was placed in the back seat of the van next to two state inmates from another facility, even though the front row of seats in the van's inmate compartment was empty.

Mr. Braun alleges that for the next hour and forty minutes, while the van drove to Northern State Prison in Newark, he was "subjected to a barrage of harassment, intimidation, physical assault and psychological torture."  (Compl. ¶ 142).  Specifically, Mr. Braun alleges that one of the other prisoners grabbed him, shoved his fist at him, threatened to punch and shank him, and pulled on his collar and sleeves looking for jewelry and a watch.  Mr. Braun alleges that the inmate told him that the "'cops ain't going to help you, they set you up and told us to have fun with you.'"  (Compl. ¶ 144).  In addition, the other inmate allegedly told Mr. Braun that the DOC officers told the inmates that he was from ADTC and was a convicted sex offender.  Mr. Braun further states that the two other inmates then threatened to torture, kill and rape him.  Finally, Mr. Braun says the DOC officers could see and hear everything that occurred and that they were laughing and making jokes about the threats and harassment.

Mr. Braun states that he requires frequent transport for both medical treatment and court hearings.  He says the assault on December 13th left him severely distraught and afraid of making future trips in DOC custody.

Mr. Braun alleges that he filed an ARF on December 22, 2005, asking to be segregated on future trips.  He says that he has not received any response to the ARF.

Defendants do not dispute those allegations.

**Claims of Plaintiff George Riley**

Plaintiff, George Riley, alleges the following:  He is Chairman of the ADTC Legal Subcommittee to the Inmate Resident Committee.  In that capacity, and on his own behalf, he wrote to Grace Rogers, ADTC Administrator, to request that procedures be put in place to protect ADTC inmates from other state prisoners when they are transported.  Bernard Goodwin, Associate Administrator, responded with a letter telling Mr. Riley that only the DOC Central Office, not ADTC, had authority to change the procedures in question.  Thus, Mr. Riley wrote to Defendant, William Plantier, Director of Operations for the DOC, and repeated his request.  He has not received a response from Mr. Plantier.

Mr. Riley does not allege that he has ever been personally assaulted by other state inmates.  However, he says he is aware of such assaults on ADTC inmates and fears that Defendants' failure to prevent such attacks presents an imminent risk to his health and safety as he will need the DOC to transport him for court appearances and medical treatment in the near future.

Defendants do not dispute those allegations.

**Claims of Plaintiff James J. Krivacska**

Plaintiff, James J. Krivacska, like Mr. Riley, does not allege that he has ever been personally assaulted by other state inmates.  On the contrary, Mr. Krivacska describes his May

31, 2005 visit to NJSP that transpired without incident.  Presumably, his account serves as an example of how Plaintiffs wish to be transported as Mr. Krivacska describes being segregated from other inmates at all times and says that DOC officers protected him from other inmates and took precautions to conceal his identity as an ADTC inmate.

Despite that positive experience, Mr. Krivacska alleges that he is afraid of future trips, either for medical care or court proceedings, because of what happened to Mr. Cornwell on May 24, 2005.  Mr. Krivacska alleges that he filed an Administrative Remedy Form ("ARF") expressing his concern regarding the assault on Mr. Cornwell and indicating his fear of making future trips for medical care and court proceedings.

Mr. Goodwin allegedly responded to the ARF with the same explanation he gave to Mr. Riley, i.e., that ADTC had no authority to change transport procedures.  Mr. Krivacska alleges that he appealed Mr. Goodwin's decision to no avail.

Defendants do not dispute those allegations.

**Claims of Plaintiff Vincent Macrina**

Plaintiff, Vincent Macrina, does not claim to have been assaulted but says that on one occasion he was placed in a large holding cell with other state inmates while awaiting medical treatment.  As he alleges that he suffers from several serious medical conditions he says he needs frequent medical attention but turns it down because he is afraid of being assaulted by other state inmates during the transport process.

Defendants do not dispute those allegations.

**Claims of Plaintiff William F. Vansciver**

10

Plaintiff, William F. Vansciver, does not claim to have been assaulted but says that on various occasions, when being transported for medical purposes, DOC officers identified him as an ADTC inmate to other state inmates, thereby putting him at risk of assault.  Mr. Vansciver alleges that he suffers from serious medical conditions and needs frequent medical attention. However, he states that he has declined medical attention because of the risk involved in seeking such attention.

Defendants do not dispute those allegations.

**Claims of Plaintiff Richard Gibbs**

Plaintiff, Richard Gibbs, does not claim to have been assaulted but says he is aware of the attack on Mr. Cornwell and assault of Mr. Braun.  Although he wishes to attend court hearings connected with his post-conviction relief hearing, he says he is afraid to attend because of the risk involved in being transported to the hearings.

Defendants do not dispute those allegations.

**Assault of Todd Becka**

In addition to the above allegations Plaintiffs describe an attack on a former ADTC inmate, Todd Becka that allegedly occurred on July 20, 2004.  Mr. Becka, according to Plaintiffs' allegations, was threatened and attacked by an inmate from another facility while in transport to receive medical attention.  The details of Plaintiffs' allegations are drawn from a complaint that Mr. Becka filed with the ADTC administration.  Plaintiffs state that Mr. Becka was struck in the head and subjected to repeated threats of violence and that the DOC officers who were present at the time did nothing to protect him.

Defendants acknowledge that Mr. Becka reported being kicked in the head.  However, they state that all inmates in the vehicle were secured in leg restraints and were under constant supervision.  Moreover, the supervising officer stated that he did not observe any altercation that verified Mr. Becka's claims.  Nonetheless, Mr. Becka was taken to the medical department and the physician noted that Mr. Becka's head appeared normal.

## Other Allegations

_____In addition to those that were submitted with the original motion for preliminary relief Plaintiffs have filed numerous affidavits to supplement the record.  Plaintiff Krivacska, as well as inmates Ramoncito Ramos, Robert Pilkington, John Thomas, Paul Bechold, Randall Venzie, Michael Davidson, William Dean, Phillip Disabella, and Keith Gardner, filed affidavits describing recent trips to other facilities.  For the most part, those affidavits allege various instances in which the ADTC inmates were placed on transport vehicles and in holding cells along with inmates from other prisons, their identity as ADTC inmates was revealed, and they were subjected to verbal harassment and/or threats of physical violence and death.

Additionally, Mr. Gardner alleges that On May 5, 2006 he was held in the Garden State Youth Correctional Facility ("GSYCF") while en route to ADTC, after appearing in Middlesex County Court.  He states that he was placed in a holding tank with about 15 or 20 other inmates. He alleges that he was asked where he was from and responded that he was from ADTC.  He states that he was then verbally harassed and eventually, two inmates attempted to attack him. He alleges that a brief physical altercation ensued and that officers responded about five minutes later and separated him from the rest of the inmates.  He does not provide any details as to the physical altercation.

Defendants contend that Mr. Gardner was never taken to the GSYCF on May 5, 2006. While Mr. Gardner was taken to Middlesex County Court on that date, his trip ticket indicates that he was brought directly back to ADTC after his court appearance.  Moreover, Defendants note that Mr. Gardner's name does not appear on the GSYCF holding cell log book for May 5, 2006.  They contend that his name would be in that book if he was held there on that day.

Plaintiffs dispute the accuracy and reliability of both the trip ticket and cell log, noting several inconsistences and missing entries.  Thus, as to Mr. Gardner's allegations, there are factual questions that remain.  The circumstances warrant further investigation.

## II.  DISCUSSION

### Standard of Review for a Preliminary Injunction

A preliminary injunction "is 'an extraordinary remedy, which should be granted only in limited circumstances.'" Novartis Consumer Health, Inc. v. Johnson & Johnson, 290 F.3d 578, 586 (3d Cir. 2002) (quoting Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 800 (3d Cir. 1989)).  "[T]he movant, *by a clear showing*, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  Moreover, "[a] preliminary injunction cannot be issued when there are disputed issues of fact.  Hunterdon Transformer Co. v. Cook, No. 89-3132, 1990 U.S. Dist. LEXIS 1382, at *4 (D.N.J. Feb. 6, 1990).

> To obtain an injunction, [a movant must] demonstrate (1) that [it is] reasonably likely to prevail eventually in the litigation and (2) that [it is] likely to suffer irreparable injury without relief.  If these two threshold showings are made the District Court then considers, to the extent relevant, (3) whether an injunction would harm [the non-movant] more than denying relief would harm the [movant] and (4) whether granting relief would serve the public interest.

13

Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly, 309 F.3d 144, 157 (3d Cir. 2002).  Specifically, with respect to the second part of the analysis, "[t]o obtain injunctive relief, a party must make a clear showing of 'immediate irreparable injury' or a 'presently existing actual threat.'" Marsellis-Warner Corp. v. Rabens, 51 F. Supp. 2d 508, 528 (D.N.J. 1999) (quoting Acierno v. New Castle County, 40 F.3d 645, 655 (3d Cir. 1994)).

Under the PLRA, a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1)(A).[4]  Moreover, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).

**1.   Likelihood of success on the merits**

Plaintiff's original motion for a preliminary injunction was granted because Plaintiffs demonstrated a reasonable likelihood of succeeding in their Eighth Amendment claim by showing that Defendants' alleged practice of identifying them as sex offenders and refusing to separate them from other state inmates creates an unreasonable risk that they will be assaulted and additionally prevents them from seeking necessary medical care.

Defendants argue that the preliminary injunction should be terminated and that a second preliminary injunction should not be issued because the assaults on Mr. Cornwell, Mr. Braun, and Mr. Becka were isolated incidents and do not demonstrate a pattern of violence.

---

[4] Prospective relief is defined as "all relief other than compensatory monetary damages" and thus includes injunctive relief.  18 U.S.C. § 3626(g)(7).

Specifically, Defendants state that between January, 2004 and January, 2006 a total of 1,749 inmate transports involving ADTC inmates were performed and all but three of them were completed without incident.  Thus, Defendants contend, they safely transported ADTC inmates 99.83% of the time.

But as Plaintiffs point out, that analysis is flawed.  Defendants attempt to show that the preliminary injunction is unnecessary because transport conditions are generally safe.  But in evaluating the need for a preliminary injunction not all of the 1,749 trips are relevant because many of them do not involve the circumstances and conditions that the preliminary injunction is intended to remedy.  As the preliminary injunction is intended to protect ADTC inmates from being assaulted by other state inmates, an evaluation of the need for that injunction should only include those instances when ADTC inmates were held in close proximity to other state inmates.  Defendants' analysis is too broad because some of the 1,749 transports didn't even involve ADTC inmates and others involved ADTC inmates who were segregated from other inmates during transport.

For example, some of the trips include new admissions to ADTC involving inmates from other jails.  Those prisoners are not yet ADTC inmates and are therefore less likely to be targeted.  Additionally, ADTC services halfway-house inmates who are not at risk of assault.

Of the remaining trips, i.e., those that actually involved ADTC inmates, many did not put the inmates at risk because the ADTC inmates were never placed in holding cells with other inmates.  For example, Plaintiffs contend they have never been segregated from other inmates when they have been held at the GSYCF but have almost always been segregated when held at the NJSP.  Thus, the incident rate at the GSYCF is likely to be higher than the incident rate at the

15

NJSP.

Moreover, Defendants assume that the assaults on Mr. Cornwell, Mr. Braun, and Mr. Becka are the only assaults that have occurred over the last two years.  But that conclusion is presumptuous as the number of reported incidents does not necessarily equal the number of actual incidents.

Regardless, a low incident rate does not necessarily preclude finding in Plaintiffs' favor. Plaintiffs can satisfy their burden by simply presenting "evidence that . . . harm . . . occurred on numerous occasions." Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).  In Liles, 225 F. Supp. at 462, two inmates brought a cruel and unusual punishment claim against DOC supervisors and employees alleging that the defendants' policy of having some inmates sleep on mattresses on the floor of their cells, near the toilet, such that they were splashed with urine when other inmates used the toilet, led to several fights breaking out between inmates.  Plaintiffs alleged that the condition led to one of the plaintiffs having a fight with another inmate on one occasion and the other plaintiff having fights on at least two occasions.  Id.  The court said that those "incidents establish[ed] a pattern of violence . . . ." Id.

Finally, although there have only been two undisputed physical assaults,[5] many other inmates allege that they have been verbally harassed and threatened with violence and even death, thus bolstering Plaintiffs' claim that the risk of future harm is great.

Therefore, despite Defendants recently submitted affidavits and their argument that most transports are safe, Plaintiffs have demonstrated a likelihood of success on the merits.

_____

[5] The assaults on Mr. Cornwell and Mr. Brown are undisputed.  There remain questions of fact as to the assaults on Mr. Becka and Mr. Gardner.

With regard to the present motions Defendants also argue, for the first time, that Plaintiffs complaint should be dismissed because they have failed to fully exhaust their administrative remedies.  42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Defendants cite <u>Rivera v. Whitman</u>, 161 F. Supp. 2d 337, 341 (D.N.J. 2001) for the proposition that § 1997e(a) requires total exhaustion of all claims before Plaintiffs may file a complaint with this court.  Defendants argue that Plaintiffs have failed to meet that requirement because only two of the Plaintiffs have filed ARFs that relate to the present complaint and those ARFs did not include some of the allegations that are in the complaint.

Thus, Defendants are essentially arguing that the state never had the opportunity to remedy many of the violations in the current complaint.  As such, they contend that the entire complaint should be dismissed because Plaintiffs have not fully exhausted their administrative remedies.

But in the present case the response that Mr. Krivacska received regarding his ARF made it clear that any further attempt for administrative relief by any of the Plaintiffs would have been futile as that response indicated that ADTC did not have the authority to remedy the alleged violations.

Mr. Riley received a similar response when he wrote a letter to the ADTC Administrator, Grace Rogers, detailing his safety concerns.  From Mr. Krivacska's ARF and Mr. Riley's letter

the ADTC administration was notified of the alleged dangerous condition and was given an opportunity to remedy the situation.  Despite their apparent lack of authority to change transportation procedures the ADTC administration has an obligation to protect its inmates and could have worked with the DOC to devise a solution.

Additionally, upon hearing that ADTC could not remedy the situation, Mr. Riley wrote to Defendant, Mr. Plantier, Director of Operations for the DOC.  Mr. Riley has not received any response to that letter.

For this court to dismiss the complaint and require each Plaintiff to file an ARF so that each of them may receive the same response, or non-response, that Mr. Krivacska and Mr. Riley received before allowing them to continue with the present suit would be nothing more than a waste of time for everyone involved.  Plaintiffs attempted to resolve their concerns at the administrative level and Defendants had sufficient opportunity to address the situation themselves.  Thus, Plaintiffs have sufficiently exhausted their administrative remedies.

Additionally, Defendants argue that Plaintiffs claims are barred as a matter of law because a § 1983 claim cannot be premised upon a theory of respondeat superior liability.  They contend that Plaintiffs have not shown that Defendants Brown and Plantier had actual knowledge of the alleged violations.  This issue was thoroughly discussed in the March 16, 2006 opinion.  As such, it need not be discussed at length here.

In general, Plaintiffs satisfied their burden for proving a supervisor-centered claim by showing that numerous prison officials had actual knowledge of the unreasonable risk created by the DOC's policies and practices.  Riley v. Brown, No. 06-331, slip op. at 12-15 (D.N.J. Mar. 16,

18

2006).

Finally, Defendants argue that "Plaintiffs claims seeking damages against the State Defendants in their official capacities are barred by the Eleventh Amendment" (Defs.' Br. in Opp. to the Mot. for a second prelim. inj. at 20). As Plaintiffs' complaint makes no demand for damages, that argument is moot.

## 2. **Likelihood of suffering irreparable injury**

Plaintiffs' original motion for a preliminary injunction was granted because the evidence of assaults on Mr. Cornwell, Mr. Braun, and Mr Becka; along with Plaintiffs' allegations that ADTC inmates are targeted by other inmates because of their status as sex offenders and because the allegation that they are being placed in holding cells with other inmates such that prison guards cannot prevent potential assaults, established a likelihood that Plaintiffs would be assaulted again if an injunction was not issued, and because the likelihood of future assault posed a significant obstacle to Plaintiffs' ability to receive necessary medical care.

Defendants argue that the preliminary injunction should be terminated because the DOC has policies and procedures in place to protect ADTC inmates and thus, they are not likely to suffer irreparable injury. Specifically, Defendants state that DOC policy requires the following:

• Inmates are shackled during transport with leg irons, belly chains, and wrist shackles.

• Inmates are under constant surveillance during transport and while in holding cells.

• Officers do not identify inmates as being from a particular institution or announce to other inmates the origin of any other inmate.

• Wrist shackles and belly chains are removed when a prisoner is placed in a holding cell

but leg irons are not removed.

•       When an altercation occurs between inmates in a holding cell the observing officer notifies Central Control of a Code 33.  That officer is instructed to wait for backup until entering the cell to stop the fight.

•       Altercations between inmates are to be detailed in written reports that are submitted to the Control Supervisor before the staff leaves the institution at the end of the shift.  Those incidents are also referred to the Special Investigations Division ("SID") for an immediate inquiry.  If the SID finds that an inmate threatened or assaulted another inmate, the former inmate is brought up on disciplinary charges.

But despite the above policies, ADTC inmates have been assaulted on transport vehicles and in holding cells.  Additionally, many allege that they have been threatened with physical violence and are afraid to seek medical treatment because of the risk involved in seeking such treatment.

    The DOC's policy of shackling inmates and supervising them during transportation is ineffective because, according to several inmates' statements, ADTC inmates are often seated next to or directly in front of other state inmates.  Thus placing them in such close proximity that the shackles can not prevent the other inmates from grabbing or hitting the ADTC inmates.  Moreover, several ADTC inmates have stated that DOC officers sit in the front of the vehicle with their backs to the prisoners and are unaware or uninterested in what transpires behind them.

    As to the DOC's policy against identifying the facility in which an inmate is housed, nearly all of the inmates who submitted affidavits in this case state that other state inmates learned of their origin one way or another.  Thus, the DOC policy of concealing inmates' origins

fails to prevent other inmates from learning the identity of ADTC inmates.

With regard to the policies relating to inmates' confinement in holding cells: leg shackles are not enough to keep one inmate from attacking another; a prison guard's presence outside of a holding cell cannot stop fights between inmates until a substantial amount of time has passed; and, the reporting process, while important, is not enough to prevent some inmates from attacking others.

For the above reasons, the DOC's policies do not sufficiently protect ADTC inmates from other state inmates.

Defendants also argue that the court's reliance on Boone v. Brown, No. 05-750, 2005 U.S. Dist. LEXIS 18131 (D.N.J. Aug. 22, 2005), Hutto v. Finney, 437 U.S. 678 (U.S. 1978), Gates v. Collier, 501 F.2d 1291 (5th Cir. 1974), and Helling v. McKinney, 509 U.S. 25 (U.S. 1993) is misplaced as those cases all involved conditions in which the harm to the various plaintiffs was virtually certain, unlike the present case, in which, Defendants contend, it is extremely unlikely that Plaintiffs will suffer any harm because 99.83% of prison transports are conducted without incident.  But as discussed above, Defendants success rate is deceiving as it overstates the number of transports that are relevant to the present case and possibly understates the number of incidents in the last two years.

Moreover, given the assaults on Mr. Cornwell, Mr. Becka, and Mr. Braun, and the violent threats received by several other inmates, along with the animosity that other state inmates have displayed toward ADTC inmates, and the close proximity in which those inmates are placed on transport vehicles and in holding cells, future attacks are virtually certain.  And as discussed in

21

the March 16, 2006 opinion, the risk of suffering such an attack effectively denies ADTC inmates their right to medical treatment.

Therefore, Plaintiffs have demonstrated a likelihood of suffering irreparable injury.

**3.  Harm imposed on Defendants**

Generally, an injunction should not be issued if it will harm the non-moving party more than the moving party would be harmed if relief was denied.  Defendants contend that the injunction imposes substantial hardship on them.  However, they fail explain how they are burdened or why it is difficult for them to comply with the injunction.  In fact, Defendants' reason for opposing several of the provisions in the preliminary injunction are that they already have policies in place that require them to do exactly what the injunction demands of them.  To the extent that the injunction merely requires Defendants to comply with their own policies, it does not impose a substantial burden on them.  To the extent that the preliminary injunction imposes additional requirements on Defendants, those requirements are minimal.

An example is provision i of the preliminary injunction, which provides that Defendants and all those operating under their direction and control are ordered that when Avenel inmates are held or transported with inmates from other correctional institutions they shall not be identified as inmates of Avenel.  Defendants contend that "ADTC inmates are _not_ identified . . . by DOC officers during transports."  (Defs.' Br. in supp. of mot. to dissolve at 22) (emphasis in original).  Thus, to the extent that the preliminary injunction prohibits Defendants and all of those under their direction and control from revealing Avenel inmates origin, Defendants argue that the preliminary injunction is unnecessary.  Such an argument does not explain why the

22

injunction poses a substantial burden on Defendants.

Defendants also argue that they cannot prevent court officials, or the Avenel inmates themselves, from exposing Avenel inmates' origins. Thus, they argue, the injunction is too broad. To the extent, if any, that the injunction requires Defendants to prevent Avenel inmates and court officials from revealing the Avenel inmates' origins, or to the extent, if any, that the preliminary injunction requires Defendants to prevent other inmates from deciphering an Avenel inmates' origin through incidental information, such as seeing an inmate picked up from the ADTC, the injunction will be modified such that it only enjoins Defendants and those under their direction and control from expressly announcing that an inmate is from Avenel.

As to provision ii of the preliminary injunction, Defendants are enjoined from confining inmates from other correctional institutions in a vehicle or holding area such that they have physical access to Avenel inmates unless a guard is present who is able to prevent the Avenel inmates from being subjected to violence from other inmates. Defendants argue that their internal policies require officers to be present and supervise all inmates during transport and while in holding cells. They further state that there is no evidence that the DOC has failed to have an officer present in those circumstances.

As to this provision, the injunction requires Defendants to do more than what their policy dictates. The injunction not only requires Defendants to have an officer present, it requires that the officer be able to prevent Avenel inmates from being subjected to violence from other inmates. From the evidence submitted since the injunction was issued, and based on Defendants' description of their policy of announcing a Code 33 when an altercation between inmates in a holding cell ensues, and due to the fact that the Code 33 response to the attack on Mr. Cornwell

23

allowed approximately 12 minutes to pass before the attack was quelled, it is clear that Defendants' current policy does not satisfy the requirements in the injunction because the supervising officer is not able to prevent violence against Avenel inmates until the adequate backup has arrived.  Requiring the supervising officer to go into the holding cell before backup arrives would no doubt endanger the supervising officer.  On the other hand, requiring Defendants to post a group of officers outside of a holding cell, so they can immediately respond to a fight in the event that one should occur, would be terribly inefficient.  Thus, the only reasonable alternative that can effectively prevent violence against ADTC inmates is to hold them in separate cells.  Defendants have provided no explanation as to why such a requirement is unduly burdensome.

As this provision relates to the transport of prisoners, Defendants have not explained why ADTC inmates cannot be seated apart from other inmates such that they are not next to or directly in front of other inmates.

Thus, the preliminary injunction will be modified to require Defendants to confine ADTC inmates in separate holding cells and seat them such that they are out of reach of other inmates during transport.  Such requirements will not only ensure the inmates' safety, it will reduce the likelihood of fights between inmates and thereby protect the officers who are responsible for breaking up those fights.

As to provision iii of the preliminary injunction, Defendants are required to halt all verbal and physical assaults upon ADTC inmates.  Defendants once again argue that they already have policies and procedures in place that make this provision unnecessary.  If that is the case, it does not impose any undue burden upon Defendants.  As discussed above, the DOC policy of

24

responding to inmate altercations by calling a Code 33 is an inadequate response to inmate altercations that occur in holding cells. Holding ADTC inmates in separate cells is necessary to reduce the risk of such altercations.

As applied to inmate transport, and as discussed above, the injunction will be modified such that ADTC inmates are separated from other inmates on the transport vehicles. DOC officers will be required to enforce that separation in order to ensure that other inmates do not move next to ADTC inmates such that they can harass and/or assault them. Such a policy should prevent altercations and ultimately protect DOC officers as well as inmates.

Provision iv of the preliminary injunction requires prison authorities to investigate and promptly report any violence committed against Avenel inmates. Defendants state that they already have a policy requiring such incidents to be reported and investigated. Thus, that provision of the preliminary injunction does not impose any significant burden on Defendants as it merely requires them to comply with their own procedures.

As discussed above, most of the requirements imposed by the preliminary injunction impose very little, if any, burden on Defendants. To the extent that provision i creates a requirement beyond Defendants' control, it will be modified. To the extent that provisions ii and iii are ineffective or place prison guards at greater risk, they will be modified.

## 4. **Public interest**

As the preliminary injunction will protect ADTC inmates from cruel and unusual punishment while requiring very little from the DOC, it is in the public's best interest to impose the injunction.

25

**Requirements of the Prison Litigation Reform Act**

Under the PLRA, a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).[6] Moreover, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." 18 U.S.C. § 3626(a)(1)(A).

**1. Whether the injunction is narrowly drawn and extends no further than necessary**

Defendants argue that the preliminary injunction is overly broad because it grants relief not only to Plaintiffs but to the entire class of ADTC inmates, and does so even though those inmates have not been certified as a class. Such extensive relief, Defendants contend, is not justified by the record. But although the ADTC inmates have not been certified as a class, it is clear that the past harms and threat of future harms extend to all ADTC inmates, not just those named as Plaintiffs in this case. The record shows that other state inmates harass, threaten, and assault ADTC inmates without hindrance. They are not targeting specific ADTC inmates. Rather, they are targeting whichever ADTC inmates they happen to meet, solely because of their status as ADTC inmates. Thus, the preliminary injunction is not overly broad because it applies to a particular group of inmates who are likely to be targeted by other state inmates and it does not apply to any inmates that are unlikely to be targeted.

Moreover, the preliminary injunction only applies to those situations that have proven to

---

[6] Prospective relief is defined as "all relief other than compensatory monetary damages" and thus includes injunctive relief. 18 U.S.C. § 3626(g)(7).

pose a substantial risk to ADTC inmates' safety, i.e., the injunction only requires additional

safeguards with respect to the manner in which ADTC inmates are transported and confined in

holding cells.  It does not interfere with the method by which inmates are escorted from holding

cells to the infirmary, the way in which they are seated and supervised in a reception area while

they await medical treatment, nor the method by which they are strip-searched.  There is no

evidence that those procedures place inmates at risk, thus they are unaffected by the preliminary

injunction.  As such, the preliminary injunction is narrowly drawn and extends no further than

necessary because it only applies to those inmates that are being targeted and only affects the

procedures that have placed them in danger.

## 2.  Whether the injunction is the least intrusive means necessary to correct the violation

There can hardly be a less intrusive imposition than an order that requires an entity to

comply with its own policies and procedures.  As discussed above, provisions i and iv of the

preliminary injunction require Defendants to do nothing more than enforce their own policies.

As to provisions ii and iii of the preliminary injunction, also discussed above, the March

16, 2006 order requires that ADTC inmates be confined such that a supervising officer is able to

quell any assault that may take place, and directed those officers to do so in the event that an

inmate is attacked.  Those provisions were intended to direct Defendants to be vigilant in their

efforts to protect inmates from harm, without requiring Defendants to make any significant

changes to their existing policies and procedures.  However, based on Defendants' description of

their Code 33 procedure and the risk that prison guards face when they enter a holding cell to

quell an altercation between inmates, those provisions cannot effectively protect ADTC inmates

without placing prison guards in greater danger.  Thus, the least intrusive way to correct the

violations in this case is to require that ADTC inmates be confined in separate holding cells and seated away from other inmates during transport.  Such a requirement should limit the number of altercations between inmates and thereby reduce the risk to prison officials as well.

As Defendants have offered no less intrusive method, and have not argued that such a requirement would unduly burden them, a new preliminary injunction requiring that ADTC inmates be segregated during transport and confined in separate holding cells, will be issued.

**Adverse impact on public safety or the operation of the criminal justice system**

The preliminary injunction will not have any impact on public safety.  As discussed above, it has only minimal impact on the operation of the criminal justice system.

**CONCLUSION**

For the reasons set forth above, Plaintiffs' motion for a second preliminary injunction is granted.  Plaintiffs' motion to postpone the stay of the original preliminary injunction is dismissed as moot.  Defendants' motion to dissolve the original preliminary injunction is dismissed as moot.  Defendants' motion to seal various confidential documents will be addressed in a separate opinion.

Moreover, Defendants, Devon Brown and William Plantier and all those operating under their direction and control will be preliminarily enjoined, directed and ordered as follows:

1.      When inmates are removed from ADTC and held or transported with inmates from other correctional institutions: i) Defendants and all those under their direction and control shall not identify ADTC inmates as ADTC inmates; ii) inmates from other correctional institutions shall be seated out of reach from ADTC inmates on transport vehicles and

DOC officers will enforce the separation between them; iii) ADTC inmates will be held in separate holding cells from other state inmates; iv) guards and other prison officials shall be directed to halt forthwith any verbal or physical assaults made by inmates upon ADTC inmates; v) prison authorities shall investigate and promptly report upon any violence committed against any ADTC inmates;

2.      Defendants and Plaintiffs may apply to the Court for any modification of the accompanying order that may be necessary to accommodate prison administration or may be necessary to effectuate its purpose of protecting Avenel inmates from physical and other abuse.

3.      A ruling on Plaintiffs' applications for class designation and appointment of an attorney will be deferred until it can be determined whether full relief can be effected through implementation of the accompanying order.

/s/ Dickinson R. Debevoise

DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated:        June 20, 2006